# EXHIBIT A

1   XAVIER BECERRA
    Attorney General of California
2   MICHAEL L. NEWMAN
    Senior Assistant Attorney General
3   SUSAN SLAGER
    Supervising Deputy Attorney General
4   JASLEEN K. SINGH
    MARISSA S. MALOUFF (SBN 316046)
5   Deputy Attorneys General
        300 S. Spring St., Suite 1702
6       Los Angeles, CA 90013
        Telephone:  (213) 269-6467
7       Fax:  (213) 897-7605
        E-mail:  Marissa.Malouff@doj.ca.gov
8   *Attorneys for Amicus Curiae State of California*

9

10                      IN THE UNITED STATES DISTRICT COURT

11                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                            SAN FRANCISCO DIVISION

13

14   **IMMIGRATION EQUALITY, et al.,**          Case No. 3:20-cv-09258-JD

                                      Plaintiffs,   **[PROPOSED] BRIEF OF AMICI**
15                                                  **CURIAE STATES IN SUPPORT OF**
                                                    **PLAINTIFFS' MOTION FOR A**
16              v.                                  **TEMPORARY RESTRAINING ORDER,**
                                                    **PRELIMINARY INJUNCTION, AND**
17   **U.S. DEPARTMENT OF**                         **STAY UNDER 5 U.S.C. § 705**
     **HOMELAND SECURITY, et al.,**
18                                                  Judge:          Honorable James Donato
                                      **Defendants.**   Hearing Date: January 7, 2021
19                                                  Action Filed:  December 21, 2020

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction and Statement of Interest.............................................................................. 1

Argument ........................................................................................................................... 2

I.    The Rule Undermines the States' Interests by Depriving Asylum Seekers of Protection and Increasing Family Separations. ................................... 2

    A.    The Rule Undermines the States' Interest in Providing Refuge to Asylum Seekers. ............................................................................. 2

        1.    The Rule Effectively Requires Applicants to File for Protection in Third Countries, Disregarding Their Safety............. 3

        2.    By Making One Year of Unlawful Presence a Negative Factor, the Rule Will Seriously Harm Trauma Victims. ................ 5

        3.    Most Discretionary Factors Apply to Unaccompanied Children........................................................................................ 6

    B.    The Rule Undermines the States' Interest in Family Unity. ...................... 7

II.    The Rule Hinders the States' Ability to Enforce Their Own Laws........................ 8

III.    The Rule Burdens the States' Programs, Many of Which are Designed to Support Immigrants. ........................................................................................... 10

IV.    Asylees and Asylum Seekers are Vital to the Success of the States' Economies and the Prosperity and Health of the States' Communities. .............. 13

Conclusion....................................................................................................................... 15

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Alaska v. U.S. Dep't of Transp.*
868 F.2d 441 (D.C. Cir. 1989) ............................................................................. 9

*E. Bay Sanctuary Covenant v. Barr*
385 F. Supp. 3d 922 (N.D. Cal.), aff'd, 964 F.3d 832 (9th Cir. 2020) ..................... 4

*Haniffa v. Gonzales*
165 F. App'x 28 (2d Cir. 2006) ............................................................................. 7

*J.O.P. v. U.S. Dep't of Homeland Sec.*
409 F. Supp. 3d 367 (D. Md. 2019) ...................................................................... 6

*Leiva-Perez v. Holder*
640 F.3d 962 (9th Cir. 2011) ................................................................................ 7

*Moore v. City of East Cleveland*
431 U.S. 494 (1977) ............................................................................................. 7

*Mukamusoni v. Ashcroft*
390 F.3d 110 (1st Cir. 2004) ................................................................................ 5

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*
434 U.S. 1345 (1977) ........................................................................................... 9

*Solis-Espinoza v. Gonzales*
401 F.3d 1090 (9th Cir. 2005) .............................................................................. 8

**FEDERAL STATUTES**

8 United States Code
§ 1158 ..............................................................................................................5, 6, 7
§ 1611 ................................................................................................................... 12

Refugee Act of 1980, S. Rep. No. 96-256 (1979), *as reprinted in* 1980
U.S.C.C.A.N. 141 ................................................................................................. 2

William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008.
Pub. L. No. 110-457, 122 Stat. 5044 .................................................................... 6

**STATE STATUTES**

California Business & Professions Code
§ 17200 ................................................................................................................. 9

1
2

### TABLE OF AUTHORITIES
#### (continued)

**Page**

3
California Governent Code
4
    §§ 12900-12996 ................................................................................... 9

5
California Labor Code
    §§ 200-889 ......................................................................................... 9
6
    §§ 1171-1206 ..................................................................................... 9

7
District of Columbia Code
    §§ 2-220.01, *et seq.* ........................................................................ 9
8
    §§ 32-531.01, *et seq.* ...................................................................... 9
    §§ 32-1001, *et seq.* ......................................................................... 9
9
    §§ 32-1301, *et. seq.* ........................................................................ 9
10
    §§ 32-1331.01, *et seq.* .................................................................... 9

11
New Jersey Statutes Annotated
    §§ 10:5-1, *et seq.* ............................................................................ 9
12
    §§ 34:11-56a to -56a38 ..................................................................... 9

13
New York Labor Law
    Article 5 .............................................................................................. 9
14
    Article 6 .............................................................................................. 9
    Article 19 ............................................................................................ 9
15
    Article 19-A ........................................................................................ 9

16
New York Workers' Compensation Law § 17 ........................................ 9
17

**FEDERAL REGULATIONS**
18

19
8 Code of Federal Regulations
    § 208.4 ................................................................................................ 6
20
    § 208.16 .............................................................................................. 6

21
*Procedures for Asylum and Withholding of Removal; Credible Fear and*
22
    *Reasonable Fear Review*, 85 Federal Register 80,274 .................................. *passim*

**OTHER AUTHORITIES**
23

24
*5 Things You Should Know About Stress*, Nat'l Inst. Mental Health ........................................... 12

25
ACLU, *Freezing Out Justice* (May 3, 2018) ............................................ 9

26
Allison Abrams, *LCSW-R, Damage of Separating Families*, Psych. Today (June
    22, 2018) ............................................................................................ 8
27

28
Am. Immigration Council, *Immigrants in California* (June 2020) ............................................. 13

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

Am. Immigration Council, *Immigrants in New York* (June 2020) ................................. 13

4

5

Amnesty Int'l, *No Safe Place: Salvadorans, Guatemalans and Honduras Seeking Asylum in Mexico Based on Their Sexual Orientation and/or Gender Identity* (Nov. 2017).................................................................................................................... 5

6

7

Anjali Fleury, *Fleeing to Mexico for Safety: The Perilous Journey for Migrant Women*, United Nations Univ. (May 4, 2016)............................................................ 4

8

9

Anna Gorman, *Medical Clinics that Treat Refugees Help Determine the Case for Asylum*, NPR (July 10, 2018) ....................................................................... 12

10

Associated Press, *Overcrowding, Abuse Seen at Mexico Migrant Detention Center*, KTLA (June 17, 2019)............................................................................................ 4

11

12

Cal. Ass'n of Pub. Hosps. & Health Sys., *About California's Public Health Care System*.................................................................................................................... 12

13

Cal. Dep't of Soc. Serv., *Immigration Servs. Funding* ................................................. 10

14

15

Colleen K. Vesely, Ph.D., et al., *Immigrant Families Across the Life Course: Policy Impacts on Physical and Mental Health*, Nat'l Council on Family Relations (2019)................................................................................................... 8

16

Comment on FR Doc # 2020-12575.................................................................................. 2

17

D.C. Dep't of Health Care Finance, *DC Healthcare Alliance Program* ...................... 11

18

Daniel Costa, *California leads the way*, Econ. Policy Inst. (Mar. 22, 2018)................... 9

19

20

21

Director James R. McHenry III, Exec. Office of Immigration Review, *Guidance Regarding New Regulations Governing Procedures For Asylum And Withholding Of Removal And Credible Fear And Reasonable Fear Reviews* (Dec. 11, 2020) ..................................................................................................... 1

22

23

Donald Kerwin, et al., *US Foreign-Born Essential Workers by Status and State, and the Global Pandemic,* CMS Report (May 2020) ......................................... 14

24

25

Heckathorn, et al., *Unregulated work in Chicago: The Breakdown of Workplace Protections in the Low-Wage Labor Market*, Ctr. for Urban Econ. Dev., Univ. of Ill. at Chicago (2010)....................................................................................... 10

26

27

Guila Ferrari & Gene Feder, et al., *Psychological advocacy towards healing (PATH): A randomized controlled trial of a psychological intervention in a domestic violence service setting*, PLoS ONE (2018) ......................................... 5, 6

28

iv

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3    HHS, *Frequently Asked Questions Regarding Unaccompanied Alien Children* ............................ 7

4    Human Rights First, *Delivered to Danger* (Jan. 21, 2020) ................................ 4

5    Human Rights Watch, *"At Least Let Them Work" The Denial of Work*
6    *Authorization and Assistance for Asylum Seekers in the United States* (Nov. 12, 2013) .................................................................................................... 9, 10

7    Human Rights Watch, *Closed Doors: Mexico's Failure to Protect Central*
8    *American Refugee and Migrant Children* (Mar. 31, 2016) ........................................ 4

9    Human Rights Watch, *US: Statement to the House Judiciary Committee on "The*
10   *Separation of Nuclear Families under US Immigration Law"* (Mar. 14, 2013) ...................... 8

11   Immigrant Eligibility for Health Care Programs in the United States, Nat'l Conf. St. Legis. (Oct. 19, 2017) ........................................................................ 11

12   Inst. on Taxation & Econ. Policy, *Undocumented Immigrants' State & Local Tax*
13   *Contributions* (Mar. 2017) ................................................................. 14

14   Int'l Soc'y for Traumatic Stress Studies, *Global Perspectives on the Trauma of*
15   *Hate-Based Violence* ....................................................................... 6

16   Jennifer E. DeVoe, et al., *Receipt of Preventive Care Among Adults: Insurance Status and Usual Source of Care*, 93 AM. J. PUB. HEALTH 5 (May 1, 2003) ........................ 12

17   *Mayor Bowser Announces $2.5 Million Available for FY 2020 Immigrant Justice*
18   *Legal Services Grant Program* (July 12, 2019) ................................................ 10

19   New Am. Econ., *The Contributions of New Americans in Illinois* (2018) ................................. 13

20   New Am. Econ., *New Americans in Chicago* (Nov. 2018) .......................................... 13

21   Office of Refugee Resettlement, U.S. Dep't of Health and Human Services,
22   *Unaccompanied Alien Children Released to Sponsors by State* (Sept. 27, 2019) .................... 7

23   Peng-jun Lu, et al., *Impact of health insurance status on vaccination coverage among adult populations*, 48 AM. J. PREV. MED. (Apr. 15, 2015) ........................ 12

24   Refugees Int'l, *A New Path Forward: Strengthening the Protection Landscape in*
25   *Mexico* (Nov. 12, 2020) ................................................................... 4

26   *Rejected Report Shows Revenue Brought in by Refugees*, N.Y. TIMES (Sept. 19,
27   2017) ..................................................................................... 14

28

### TABLE OF AUTHORITIES
**(continued)**

**Page**

Robert A. Katzmann, *Study Group on Immigrant Representation: The First Decade*, 87 FORDHAM L. REV. 485 (2018) ............................................................. 10

Robert Fairlie, *The Impact of Covid-19 on Small Business Owners: Evidence of Early-Stage Losses from the April 2020 Current Population Survey,* Stanford Inst. for Econ. Policy Research (May 2020) ...................................................... 14

Ryan Baugh, Office of Immigration Statistics, Dep't of Homeland Sec., *Annual Flow Report: Refugees and Asylees: 2019* (Sept. 2020)...................................... 1, 4

Shamsher Samra, et al., *Undocumented Patients in the Emergency Department: Challenges and Opportunities*, 20 WEST J. EMERGENCY MED. 791 (Sept. 2019).............12, 13

Stacey McMorrow, et al., *Determinants of Receipt of Recommended Preventive Services: Implications for the Affordable Care Act*, AM. J. PUB. HEALTH (Dec. 2014) .................................................................................................................. 12

TRAC Immigration, *Asylum Decisions* (Nov. 2020) ................................................. 1

U.S. Dep't of State, *Human Rights Report – China 2019* ........................................ 3, 4

U.S. Dep't of State, *2019 Report on International Religious Freedom: China (Includes Tibet, Xinjiang, Hong Kong, and Macau)*..................................... 4

United Nations High Commissioner for Refugees, States Parties to the 1951 Convention relating to the Status of Refugees and the 1967 Protocol (April 2015) .................................................................................................................... 3

1

**INTRODUCTION AND STATEMENT OF INTEREST**

2
3
4
5
6
7
8
9

The States of California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and the District of Columbia (States or *Amici* States) submit this brief in support of Plaintiffs' motion for a temporary restraining order, preliminary injunction, and stay, to enjoin the final rule published by the U.S. Department of Homeland Security (DHS) and U.S. Department of Justice (US DOJ) (together, the Defendants): *Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review*, 85 Fed. Reg. 80,274 (the Rule).

10
11
12
13
14
15

The Rule introduces a litany of provisions that will dramatically transform the asylum system into an unrecognizable process in which only a narrow few can attain protection. These changes will have an incalculable impact on thousands of current and future State residents.[1] *Amici* States are home to at least 60.7 percent of the total number of individuals granted affirmative asylum in the United States in fiscal year (FY) 2019.[2] In FY 2019, immigration courts in the States issued approximately 41,910 asylum decisions.[3]

16
17
18
19
20

In harming current and future residents, the Rule harms the States. Specifically, the Rule: (1) undermines the States' interests by denying protection to those in need and increasing family separations; (2) pushes putative asylees into the shadows, impairing the States' ability to enforce criminal, labor, and civil rights laws; (3) burdens State-funded programs, including legal services and healthcare; and (4) deprives the States of asylum seekers' contributions, which are integral to

21
22

23
24
25
26

[1] The States are concerned that aspects of the Rule will apply to current residents with pending applications. The Rule states it will not apply retroactively, except as to provisions that "codif[y] existing law." 85 Fed. Reg. 80,380. But US DOJ guidance states that "many parts of the rule merely incorporate established principles of existing statutory or case law into the regulations." Director James R. McHenry III, Exec. Office of Immigration Review, *Guidance Regarding New Regulations Governing Procedures For Asylum And Withholding Of Removal And Credible Fear And Reasonable Fear Reviews* (Dec. 11, 2020), https://tinyurl.com/EOIRAsy.

27

[2] Ryan Baugh, Office of Immigration Statistics, Dep't of Homeland Sec., *Annual Flow Report: Refugees and Asylees: 2019* tbl. 13 (Sept. 2020), https://tinyurl.com/BaughFlowReport.

28

[3] TRAC Immigration, *Asylum Decisions* (Nov. 2020), https://tinyurl.com/TRACfy2019

the States' social fabric and economy, particularly during the COVID-19 pandemic.[4] Thus, a

temporary restraining order and preliminary injunction will benefit the public interest.

**ARGUMENT**

**I.    THE RULE UNDERMINES THE STATES' INTERESTS BY DEPRIVING ASYLUM SEEKERS OF PROTECTION AND INCREASING FAMILY SEPARATIONS.**

> **A.    The Rule Undermines the States' Interest in Providing Refuge to Asylum Seekers.**

The purpose of the Refugee Act of 1980, which established the present asylum system, was

to codify "one of the oldest themes in America's history—welcoming homeless refugees to our

shores." S. Rep. No. 96-256, at 1 (1979), *as reprinted in* 1980 U.S.C.C.A.N. 141, 141. The *Amici*

States have a profound interest in upholding this fundamental American tenet—especially where,

as here, the Federal Government fails to do so.

The Rule's changes to the asylum system are numerous and varied, but each change shares

a common thread—making humanitarian protection more difficult to obtain. Among several

restrictive and punitive provisions, the Rule codifies that the Attorney General "will not" grant

asylum if nine negative discretionary factors are present, unless the applicant can meet the high

bar of establishing "extraordinary circumstances"[5] or prove by "clear and convincing evidence[]

that the denial of asylum would result in [an] exceptional and extremely unusual hardship." 85

Fed. Reg. 80,396-97. Even if the applicant makes this showing, the application can still be denied

on discretion "depending on the gravity" underlying the application of the negative discretionary

factor. *Id.* at 80,397. The Rule further provides "significant[]" adverse discretionary factors that

adjudicators "shall" consider. *Id.* at 80,396. The Rule also narrows the grounds upon which an

applicant can be granted asylum, and allows immigration judges to pretermit asylum claims

before the applicant has had an opportunity for a full hearing. *Id.* at 80,280, 80,395. The burden of

---

[4] The States note that twenty-three States' Attorneys General, including many of the signatories to this brief, submitted a comment letter expressing concerns about the Rule's potential impacts on the States' interest in family unity, law enforcement, State-funded programs, and the States' economies and workforce during COVID-19. Comment on FR Doc # 2020-12575, https://tinyurl.com/AGscomment. The Rule makes no mention of the States' unique concerns.
[5] The Rule does not define extraordinary circumstances but describes the term as encompassing "those involving national security or foreign policy considerations," indicating an extremely high standard that will not apply in the vast majority of cases. 85 Fed. Reg. 80,397.

2

these new barriers will fall hardest on the States' most vulnerable residents, depriving many otherwise eligible applicants from protection.

While recognizing that several components of the Rule are bound to have the same result, the States highlight how the Rule's discretionary factors will effectively block bona fide asylum seekers from relief in three ways by: (1) applying to asylum seekers who did not seek protection in a third country, even if it would be dangerous or futile to do so; (2) rendering the filing of an application after one-year of unlawful presence to be a negative factor, potentially denying relief to those who failed to file due to trauma; and (3) applying to unaccompanied children.

### 1.     The Rule Effectively Requires Applicants to File for Protection in Third Countries, Disregarding Their Safety.

The Rule considers an applicant's failure to apply for humanitarian protection in at least one country through which they transited to be a significant adverse discretionary factor—ignoring that for many applicants, such an application would be infeasible and unsafe. 85 Fed. Reg. 80,282. In addition, the Rule treats as negative factors that will result in denial: (1) an applicant's failure to apply for humanitarian protection in a country where they were present for 14-days, and (2) an applicant's failure to apply for humanitarian protection in at least one country transited through if they transited through two or more countries. *Id.*

The Rule exempts individuals from these adverse discretionary factors if they passed through countries that are not party to refugee-related agreements and protocols. *Id.* at fn. 7. The exemption, however, is based on a false premise that countries that are signatories to refugee-related agreements and protocols provide asylum seekers with the actual ability to safely seek protection. In fact, the vast majority of countries, including those with severely repressive governments, are signatories to these agreements and protocols.[6] For instance, while China is a signatory to a refugee-related agreement, it is also oppressive to religious minorities and conducts "mass arbitrary detention" of Uighur Muslims and members of other Muslim groups.[7] Yet, under

---

[6] A total of 151 countries are parties to the 1967 Protocol and 1951 Convention. United Nations High Commissioner of Refugees, *States Parties to the 1951 Convention relating to the Status of Refugees and the 1967 Protocol* (April 2015), https://tinyurl.com/unhcrsign.

[7] U.S. Dep't of State, *Human Rights Report – China 2019* 2-3,

the Rule, asylum seekers who have a layover in China en route to the United States would be expected to apply for protection there, even if they would be at risk of persecution.

Most commonly, the Rule will compel the thousands of Central American asylum seekers who apply for protection in the United States each year to first seek protection in Mexico in order to avoid a discretionary denial.[8] But, seeking asylum in Mexico is not feasible or safe for many people. This reality, borne out in the Federal Government's own administrative record, led a federal court to preliminarily enjoin Defendants' third country transit asylum bar. *E. Bay Sanctuary Covenant v. Barr*, 385 F. Supp. 3d 922, 953 (N.D. Cal.), aff'd, 964 F.3d 832 (9th Cir. 2020) ("[T]he administrative record fails to support the conclusion that asylum in Mexico is a 'feasible alternative.'").

At the outset, there are several barriers to protection in Mexico, such as an untenable 30-day filing deadline.[9] Beyond that, asylum seekers would be at an increased risk of crime, exploitation, and persecution as they await the adjudication of their cases in Mexico. As an example of these dangers, as of January 2020, there were 816 reports of murder, rape, torture, kidnapping, and other violent assaults against asylum seekers who were forced to remain in Mexico during the pendency of their asylum cases because of Defendants' restrictive program, the "Migrant Protection Protocols."[10] Asylum seekers placed in migrant detention centers receive little reprieve, as officers with the National Migration Institute frequently extort detainees.[11] The situation would be especially dire for migrant women, who are often subject to harassment and abuse in Mexican immigration detention centers.[12] Similarly, Lesbian, Gay, Bisexual,

---

https://tinyurl.com/DeptStch; U.S. Dep't of State, *2019 Report on International Religious Freedom: China (Includes Tibet, Xinjiang, Hong Kong, and Macau)* 2, https://tinyurl.com/DOSIRF.

[8] Baugh, *supra* note 2 at tbls. 6a, 6b.

[9] Human Rights Watch, *Closed Doors: Mexico's Failure to Protect Central American Refugee and Migrant Children* (Mar. 31, 2016), https://tinyurl.com/HRWClosedDoorsMexico; Refugees Int'l, *A New Path Forward: Strengthening the Protection Landscape in Mexico* (Nov. 12, 2020), https://tinyurl.com/RefIntl2.

[10] Human Rights First, *Delivered to Danger* (Jan. 21, 2020), https://tinyurl.com/HRFMpp.

[11] Associated Press, *Overcrowding, Abuse Seen at Mexico Migrant Detention Center*, KTLA (June 17, 2019), https://tinyurl.com/APktla.

[12] Anjali Fleury, *Fleeing to Mexico for Safety: The Perilous Journey for Migrant Women*, United Nations Univ. (May 4, 2016), https://tinyurl.com/FleuryMay2016.

4

Transgender, and Queer (LGBTQ) asylum seekers in detention suffer "discrimination, sexual harassment and even aggression from the other detainees or the [center] staff."[13]

In practice, the Rule's discretionary factors will force many asylum seekers to make the excruciating choice to either apply for relief in a third country—where they may face danger or even persecution—or forgo that process and risk their claim being denied in the United States.

### 2. By Making One Year of Unlawful Presence a Negative Factor, the Rule Will Seriously Harm Trauma Victims.

Under the Rule, applicants who apply for asylum after one year of unlawful presence in the United States will ordinarily be denied on discretionary grounds. As Plaintiffs adeptly argue, this provision is at tension with the statutory one-year filing deadline for asylum applications. The statutory deadline exempts applicants from filing their application within one year if they establish either exceptional circumstances related to their ability to timely file, such as physical or mental illness, or that there are changed conditions effecting their eligibility for relief. 8 U.S.C. § 1158(a)(2)(D). But these exemptions do not expressly apply to the Rule's unlawful presence discretionary factor, and, as Defendants recognize, there will be some applicants who overcome the one-year filing deadline just to have their applications denied on discretion for failing to file within one year.[14]

This unfair outcome may befall victims suffering from post-traumatic stress disorder (PTSD), as it is well-recognized that PTSD can hinder an applicant's ability to file a timely asylum application. *See Mukamusoni v. Ashcroft*, 390 F.3d 110, 117 (1st Cir. 2004). PTSD is highly prevalent among victims of domestic violence, childhood abuse, and hate crimes.[15] This discretionary factor will be yet another obstacle to these applicants' ability to receive relief.

---

[13] Amnesty Int'l, *No Safe Place: Salvadorans, Guatemalans and Hondurans Seeking Asylum in Mexico Based on Their Sexual Orientation and/or Gender Identity* 22 (Nov. 2017), https://tinyurl.com/AmIn17 (quoting the Citizens' Council of the National Migration Institute).

[14] It does not appear that an applicant's showing of an exceptional circumstance impairing their ability to file an asylum application under 8 U.S.C. § 1158(a)(2)(D) would be an "extraordinary circumstance" to rebut this discretionary factor. Defendants recognize that there will be some applicants who meet the statutory filing deadline, but to whom the discretionary factor will apply. 85 Fed. Reg. 80,355. In response to this concern, Defendants only state that adjudicators can "consider those circumstances in accordance with the [R]ule." *Id.*

[15] Guila Ferrari & Gene Feder, et al., *Psychological advocacy towards healing (PATH): A*

5

### 3.   Most Discretionary Factors Apply to Unaccompanied Children.

Although Defendants exempted children from the Rule's unlawful entry discretionary factor, all other discretionary factors will apply to unaccompanied children, thereby making them more likely to be denied asylum. Congress expressly recognized the vulnerabilities of unaccompanied children and their unique need for protection in the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008. Pub. L. No. 110-457, 122 Stat. 5044 (TVPRA). Under the TVPRA, children are exempted from certain statutory bars to asylum, such as the safe third country agreement bar and the one-year filing deadline. 8 U.S.C. § 1158(a)(2)(E); 8 C.F.R. § 208.4(a)(5)(i). Children are also entitled to first present their asylum claims during non-adversarial interviews at the U.S. Citizenship and Immigration Services (USCIS) Asylum Office with officers trained in "child-sensitive and trauma informed interview techniques," instead of adversarial immigration court proceedings. *J.O.P. v. U.S. Dep't of Homeland Sec.*, 409 F. Supp. 3d 367, 372 (D. Md. 2019).

Yet, the Rule subjects unaccompanied children to discretionary denials of asylum for minor, but common, issues—including filing an application one year after entry, or after passing through a third country without applying for relief, rendering the statutory protections previously enacted by Congress irrelevant. With asylum off the table, these unaccompanied children will be forced to present claims for withholding of removal and protection under Convention Against Torture (CAT), which can only be granted by an immigration court. 8 C.F.R. § 208.16. As Congress recognized in enacting the TVPRA, immigration court is not the proper venue for children to present their claims, partly because those proceedings subject unaccompanied children to cross-examination about the worst moments of their lives. *See J.O.P.*, 409 F. Supp. 3d at 372 (citing 8 U.S.C. §§ 1158, 1232(d)).

In all, these discretionary factors, like several other provisions of the Rule, will prevent asylum seekers—particularly those vulnerable to abuse—from obtaining asylum. Defendants justify these obstacles to relief by reasoning that asylum is a discretionary benefit. 85 Fed. Reg.

---

*randomized controlled trial of a psychological intervention in a domestic violence service setting*, *PLoS ONE* (2018), https://tinyurl.com/psychdv; Int'l Soc'y for Traumatic Stress Studies, *Global Perspectives on the Trauma of Hate-Based Violence*, https://tinyurl.com/traumaviolence.

80,282. But discretion should not be used as a cudgel to block all but the lucky few from asylum, as it would be under the Rule. Such a result is contrary to the founding principles of the United States asylum system, the States' interests, and the public interest. *Leiva-Perez v. Holder*, 640 F.3d 962, 971 (9th Cir. 2011) (per curiam) ("deliver[ing] [asylum seekers] into the hands of their persecutors" is against the public interest).

**B.      The Rule Undermines the States' Interest in Family Unity.**

The Rule will result in the denial of protection, and subsequent deportation, for many of those who will be or are currently seeking asylum in the States. These deportations will have the consequence not just of putting an applicant at risk for persecution, but also separating them from their family members who reside in the United States.[16] Moreover, with asylum out of reach due to the Rule's discretionary factors and expanded bars to relief, withholding of removal and protection under CAT will be the only forms of relief available for many applicants. Unlike asylum, neither withholding of removal nor CAT offers any protection to an applicant's children or spouse. *See* 8 U.S.C. § 1158(b)(3)(A). The Rule could thus result in absurd situations where a parent is granted protection, but their child who does not have a separate claim is ordered removed. "The result is an almost impossible choice: live in safety while separated from one's family and their perilous life a world away, or join them in their peril and risk the probability of death or imprisonment." *See Haniffa v. Gonzales*, 165 F. App'x 28, 29 (2d Cir. 2006).

The separation of asylum seekers from their family members will harm the States, which benefit from family units that provide stability and support for their members, as well as irreplaceable care and nurturing of children. *See, e.g.*, *Moore v. City of East Cleveland*, 431 U.S. 494, 503-04 (1977) ("It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural."). The Select Commission on Immigration and Refugee Policy, a congressionally appointed commission tasked with studying immigration policy,

---

[16] *See* Office of Refugee Resettlement, U.S. Dep't of Health and Human Services (HHS), *Unaccompanied Alien Children Released to Sponsors by State* (Sept. 27, 2019), https://tinyurl.com/ORRuac (in FY 2019, over 8,000 unaccompanied children were released to sponsors residing in California); HHS, *Frequently Asked Questions Regarding Unaccompanied Alien Children*, https://tinyurl.com/HHSuac (last visited Dec. 21, 2020) (explaining that sponsors generally must be parents or close relatives).

expounded upon the necessity of family reunification in 1981:

> "Reunification . . . serves the national interest not only through the humaneness of the policy itself, but also through the promotion of the public order and wellbeing of the nation. Psychologically and socially, the reunion of family members . . . promotes the health and welfare of the United States."[17]

Indeed, family unity is the basis of the modern immigration system. *Solis-Espinoza v. Gonzales*, 401 F.3d 1090, 1094 (9th Cir. 2005) ("The Immigration and Nationality Act ('INA') was intended to keep families together.").

Because family units are a bulwark of support for all their members, separating families will further traumatize and endanger asylum seekers. Family separation can result in: irregular sleep patterns, which can lower academic achievement among children; toxic stress, which can delay brain development and cause cognitive impairment; symptoms of PTSD; and a greater risk of developing mental health disorders such as depression and anxiety.[18] Trauma can also have negative physical effects on children, such as loss of appetite, stomachaches, and headaches, which can become chronic if left untreated.[19]

The Rule's likely effect of increasing asylum denials will devastate asylum seekers and their families, with impacts that will extend to their communities and to the States.

## II.   THE RULE HINDERS THE STATES' ABILITY TO ENFORCE THEIR OWN LAWS.

The numerous barriers to asylum implemented by the Rule are likely to result in a chilling effect on asylum applications. As a result, fewer people will file for asylum and more will remain undocumented. The States will be harmed because undocumented immigrants are less likely to report crime or cooperate in state investigations of crime; and more likely to enter into the underground economy, and therefore less likely to report ongoing labor and civil rights violations. Consequently, the Rule interferes with the States' ability to enforce their penal, labor, and civil

---

[17] Human Rights Watch, *US: Statement to the House Judiciary Committee on "The Separation of Nuclear Families under US Immigration Law"* (Mar. 14, 2013), https://tinyurl.com/HRWFamilySeparation (quoting US Select Committee on Immigration and Refugee Policy, "U.S. Immigration Policy and the National Interest," 1981).
[18] Colleen K. Vesely, Ph.D., et al., *Immigrant Families Across the Life Course: Policy Impacts on Physical and Mental Health*, Nat'l Council on Family Relations (2019) https://tinyurl.com/NCFRpolicybrief.
[19] Allison Abrams, *LCSW-R, Damage of Separating Families*, Psych. Today (June 22, 2018), https://tinyurl.com/AbramsSeparation.

8

1   rights laws. The States have a fundamental interest in being able to enforce their own laws.

2   *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989). When rulemaking impinges

3   on that ability, the States suffer an injury. *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*,

4   434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers).

5          First, Undocumented individuals are less inclined to cooperate with law enforcement or

6   provide helpful information when they are a victim of a crime, for fear of engaging with state

7   actors and becoming subject to deportation.[20] The disincentive to assist law enforcement will

8   make it more difficult for States to enforce their penal laws, and puts immigrants at risk of being

9   victims of crime themselves.

10         Second, States' labor and civil rights laws, which protect their residents from wage theft,

11  exploitation, and discrimination at work, are also threatened by the Rule. *See generally*, Cal. Gov.

12  Code §§ 12900-12996 (Fair Employment and Housing Act); Cal. Bus. & Prof. Code §§ 17200

13  (Unfair Competition Law), *et seq.*; Cal. Lab. Code §§ 200-889, 1171-1206 (wage and working

14  conditions provisions) 1200; D.C. Code § 32-1301, *et. seq.* (Wage Payment and Collection Law);

15  D.C. Code § 32-1331.01, *et seq.* (Workplace Fraud Act); D.C. Code § 32-1001, et seq. (Minimum

16  Wage Revision Act); D.C. Code § 32-531.01, *et seq.* (Sick and Safe Leave Act); D.C. Code § 2-

17  220.01, et seq. (Living Wage Act); N.J. Stat. Ann. §§ 34:11-56a to -56a38 (minimum wage

18  provisions); N.J. Stat. Ann. §§ 10:5-1, *et seq.* (Law Against Discrimination); N.Y. Labor Law

19  Articles 5 (hours of labor), 6 (payment of wages), 19 (minimum wage standards), and 19-A

20  (minimum wage standards for farm workers); N.Y. Workers' Comp. Law § 17. These laws are

21  enforced without respect to immigration status, but effective enforcement relies on employees'

22  ability and willingness to report violations. Despite the significant labor and civil rights abuses

23  that befall unauthorized workers, fear of reprisal and deportation often inhibits unauthorized

24  workers from reporting such violations.[21] Asylum seekers in particular fail to report labor

25         [20] *See e.g.,* ACLU, *Freezing Out Justice* 1-5 (May 3, 2018),
    https://tinyurl.com/ACLUfreeze.
26         [21] Human Rights Watch, *"At Least Let Them Work" The Denial of Work Authorization
    and Assistance for Asylum Seekers in the United States* (Nov. 12, 2013),
27  https://tinyurl.com/yx9vp5wf; Daniel Costa, *California leads the way*, Econ. Policy Inst. (Mar.
    22, 2018), https://tinyurl.com/CostaEPI.
28

9

violations—including working weeks without pay and enduring physical abuse at work—because they fear immigration consequences.[22] A study in Chicago found that, of the immigrant workers who have suffered a workplace injury and report it to their employer, 23 percent reported being either immediately fired or threatened with deportation.[23]

In placing barriers within the asylum process, the Rule will have a chilling effect on asylum applications, which will in turn, have a chilling effect on applicants reporting abuses or engaging with law enforcement. The Rule thus directly harms the States' ability to enforce its laws.

## III.   THE RULE BURDENS THE STATES' PROGRAMS, MANY OF WHICH ARE DESIGNED TO SUPPORT IMMIGRANTS.

The Rule will burden the very programs in which the States have invested, because these programs will need to shift resources to respond the Rule's effects on asylum seekers.

First, many States have invested in legal organizations which provide services to immigrant populations. For example, in FY 2019-2020, the California Department of Social Services allocated almost $45 million to administer the Immigration Services Funding program, which provides funding to organizations that represent asylum seekers.[24] In FY 2020, the District of Columbia (District) authorized $2.5 million for Immigrant Justice Legal Services, a grant program to organizations that offer legal services to asylum seekers.[25] Such legal services are critical in light of data comparing the success of asylum seekers with and without counsel: asylum seekers who are not detained and have legal representation in immigration court proceedings prevail in 74 percent of their cases; those without representation prevail only 13 percent of the time.[26] For asylum seekers who are detained, 18 percent prevail when represented, while only three percent prevail when not represented.[27] The Rule's new pretermission provisions make

---

[22] Human Rights Watch, *"At Least Let Them Work," supra* note 21.
[23] Douglas D. Heckathorn, et al., *Unregulated work in Chicago: The Breakdown of Workplace Protections in the Low-Wage Labor Market* 18, Ctr. for Urban Econ. Dev., Univ. of Ill. at Chicago (2010), available for download at: https://tinyurl.com/UChicagoHeckathorn.
[24] Cal. Dep't of Soc. Serv. (CDSS), *Immigration Servs. Funding*, https://tinyurl.com/CDSSImm.
[25] Mayor Bowser Announces $2.5 Million Available for FY 2020 Immigrant Justice Legal Services Grant Program (July 12, 2019), https://tinyurl.com/BowserAnn.
[26] Robert A. Katzmann, *Study Group on Immigrant Representation: The First Decade*, 87 FORDHAM L. REV. 485, 486 (2018).
[27] *Id.*

10

1    obtaining counsel even more imperative for asylum applicants who need representation to

2    navigate the complex asylum system and avoid the serious consequences of having their case

3    pretermitted. Further, the Rule's expanded bars and discretionary factors will reduce the number

4    of immigrants who are eligible for asylum, forcing them to pursue more difficult forms of relief,

5    and which may require legal expertise to claim. The urgent need for legal services arising from

6    the Rule's creation of a near unrecognizable asylum process will place increased need for counsel

7    on legal organizations already managing existing caseloads.

8          Beyond the increased need for representation, the Rule will require legal organizations to

9    change their approach to asylum cases because of the new discretionary factors, altered eligibility

10   standards, and expanded bars to relief. These changes will frustrate the missions of such

11   organizations in the States and require the allocation of additional time and resources for each

12   case. Organizations will need to divert considerable resources to re-strategizing their approaches

13   to representing clients, revising their training, and re-allocating staff time. As a result, the number

14   of cases these organizations can take will decrease at a time when there will be increased need for

15   counsel for State residents. Because their funding is based, in part, on the number of cases

16   handled per year, and the number of clients they anticipate serving, the Rule will imperil the

17   organizations' sustainability. Compl. ¶ 365. Harms to these organizations redound to their

18   funders, including the States, whose priorities and funding decisions will also bear the impact of

19   the Rule.

20         Second, the Rule will place a heavy burden on the States' medical and mental health

21   programs. For example, the DC Healthcare Alliance Program is a District-funded program

22   designed to provide medical assistance to District residents who are not eligible for Medicaid,

23   such as asylum seekers.[28] Additionally, California, New York, the District of Columbia, Illinois,

24   Oregon, Massachusetts, and Washington all provide full scope health benefits to low-income

25   children regardless of immigration status.[29] The added trauma that asylum seekers will suffer, due

26   ───────────────────
           [28] D.C. Dep't of Health Care Finance, *DC Healthcare Alliance Program*,
     https://dhcf.dc.gov/service/health-care-alliance.
27         [29] Immigrant Eligibility for Health Care Programs in the United States, Nat'l Conf. St.
     Legis. (Oct. 19, 2017), https://tinyurl.com/ImmElig.

28

1  to the uncertainty surrounding their legal status given the Rule's obstacles to obtaining asylum,

2  will likely cause long-term negative health impacts. Long-term stress can contribute to serious

3  health problems including heart disease, diabetes, and a weakened immune system.[30] The States

4  will need to allocate or re-allocate resources to identify, assess, and treat asylum seekers.[31]

5        Moreover, because of the Rule's likely effect of depriving otherwise eligible asylum

6  seekers of legal status, fewer people will have work-permits and thus, employer-sponsored health

7  insurance. Many of these applicants cannot qualify for federal government-sponsored insurance

8  due to their immigration status and may be required to rely on State-funded health services. 8

9  U.S.C. § 1611. Furthermore, the uninsured have restricted access to preventative services, which

10  results in greater healthcare costs in the long term.[32] These costs will put additional pressure on

11  strained public hospitals, which often pay for the care of uninsured patients.[33] Lower insured rates

12  also harm public health at large, because the uninsured are less likely to receive vaccinations,

13  which prevent the spread of infectious diseases throughout the community—a concern especially

14  relevant as the States contend with COVID-19.[34]

15        Additionally, undocumented asylum seekers will be more fearful to obtain routine

16  healthcare because they are afraid of potential immigration consequences for seeking care.[35] This

17  harms the States' initiatives expanding healthcare to as many people as possible, particularly

18

19        [30] *See 5 Things You Should Know About Stress*, Nat'l Inst. Mental Health, https://tinyurl.com/StressNIMH (last visited Dec. 22, 2020).
20        [31] Anna Gorman, *Medical Clinics that Treat Refugees Help Determine the Case for Asylum*, NPR (July 10, 2018), https://tinyurl.com/Gorman-NPR.
21        [32] Stacey McMorrow, et al., *Determinants of Receipt of Recommended Preventive Services: Implications for the Affordable Care Act*, AM. J. PUB. HEALTH (Dec. 2014),
22  https://tinyurl.com/McMorrowPublicHealth; Jennifer E. DeVoe, et al., *Receipt of Preventive Care Among Adults: Insurance Status and Usual Source of Care*, 93 AM. J. PUB. HEALTH 5, 786-791
23  (May 1, 2003), https://tinyurl.com/DeVoePublichHealth.
       [33] Cal. Ass'n of Pub. Hosps. & Health Sys., *About California's Public Health Care*
24  *Systems*, https://tinyurl.com/y68c6m87 (public hospitals in California account for 40 percent of hospital care to the remaining uninsured in the communities they serve).
25        [34] Peng-jun Lu, et al., *Impact of health insurance status on vaccination coverage among adult populations*, 48 AM. J. PREV. MED. 647–661 (Apr. 15, 2015), https://tinyurl.com/y5es4yt4.
26        [35] Shamsher Samra, et al., *Undocumented Patients in the Emergency Department: Challenges and Opportunities*, 20 WEST J. EMERGENCY MED. 791, 792 (Sept. 2019),
27  https://tinyurl.com/UndocPatients (One in eight undocumented Latinx immigrants fears deportation when using the emergency department.).

28

during COVID-19, because the States recognize healthcare for all residents is better for the overall health of our communities. However, when individuals are afraid to get routine healthcare, state healthcare systems are tasked with addressing acute medical conditions, and scarce emergency room resources are burdened with the aftermath of preventable conditions.[36]

## IV. ASYLEES AND ASYLUM SEEKERS ARE VITAL TO THE SUCCESS OF THE STATES' ECONOMIES AND THE PROSPERITY AND HEALTH OF THE STATES' COMMUNITIES.

Immigrants, including asylum seekers, are the backbone of States' workforce and economy. By depriving putative asylees of protection, the Rule will also deprive *Amici* States of their entrepreneurism and significant contributions to the States' communities.

The following are just three examples of immigrant contributions to the States' economies:

- **California:** In California, there are 6.6 million immigrants in the State's workforce.[37] In 2018, immigrant business owners accounted for over 38 percent of all Californian entrepreneurs and generated almost $24.5 billion in business income, and immigrant-led households in California paid over $38.9 billion in state and local taxes and exercised almost $290.9 billion in spending power.[38]

- **Illinois:** Immigrants also play a big role in the economy of Illinois. In 2016, Immigrants in Chicago alone contributed $1.6 billion to the state's economy through taxes and helped create or preserve 25,664 local manufacturing jobs.[39] Also, immigrant-owned businesses generated $63.9 billion in sales in Illinois in 2018.[40]

- **New York**: In New York, 2.8 million immigrant workers comprised 28 percent of the labor force in 2018. Immigrant-led households in New York paid $35.4 billion in federal taxes and $21.8 billion in state and local taxes in 2018.[41]

---

[36] *Id.*
[37] Am. Immigration Council, *Immigrants in California* 2 (June 2020), https://tinyurl.com/AIC-ImmCA.
[38] *Id.* at 4-5.
[39] New Am. Econ., *New Americans in Chicago* 1, 4 (Nov. 2018), https://tinyurl.com/Immigrants-Chicago.
[40] New Am. Econ., *The Contributions of New Americans in Illinois* (2018), https://tinyurl.com/2018Illinois.
[41] Am. Immigration Council, *Immigrants in New York* 2, 4 (June 2020), https://tinyurl.com/Immigrants-in-NY.

13

1    Asylum seekers also contribute to the States through increased tax revenue and increased

2    purchasing power. A draft 2017 report by HHS found that over the past decade, refugees,

3    including asylees, contributed $63 billion more in tax revenue than they cost in public benefits.[42]

4    Further, undocumented immigrants residing in the States pay approximately $7.6 billion in state

5    and local taxes annually.[43] Although unauthorized workers pay taxes, tax revenue increases when

6    immigrants can legally work, and the States could stand to lose substantial revenue as a result of

7    the Rule. For example, in Massachusetts, undocumented immigrants pay an average of $184.6

8    million in state and local taxes each year, an amount that would increase to $240.8 million if they

9    had legal status and work authorization.[44] Similarly, undocumented immigrants in New Mexico

10   would have paid in excess of $8 million more in taxes in 2017 if they had full legal status.[45]

11   The vital role that immigrants, including asylum seekers, play in the States' economies

12   and communities is particularly pronounced in the context of COVID-19. Immigrants comprise

13   18 percent of the labor force deemed "essential," including 16 percent of health care workers, 31

14   percent of agricultural and farm workers, 26 percent of wholesale grocery workers, 18 percent of

15   essential retail workers (restaurants, grocery stores, gas stations, pharmacies, etc.), 24 percent of

16   construction workers, and 19 percent of workers providing service to maintain safety, sanitation,

17   and operations of essential businesses.[46] Notably, of the approximate 3 million immigrant-owned

18   businesses that were active in February 2020 across the country, about 80 percent were in

19   "essential" industries, the majority of which have been able to continue operation.[47] Even during

20   a global health pandemic, immigrants continue to provide essential services, such as health care,

21   as well as create employment opportunities to the States and their residents.

22

23   ───────────────
     [42] *Rejected Report Shows Revenue Brought in by Refugees*, N.Y. TIMES
24   (Sept. 19, 2017), https://tinyurl.com/2017DraftReport.
     [43] Inst. on Taxation & Econ. Policy, *Undocumented Immigrants' State & Local Tax*
25   *Contributions* 3 (Mar. 2017), https://tinyurl.com/ITEP-UndocTaxes.
     [44] *Id.*
     [45] *Id.*
26   [46] Donald Kerwin, et al., *US Foreign-Born Essential Workers by Status and State, and the*
     *Global Pandemic,* CMS Report 8-12 (May 2020), https://tinyurl.com/SMCPandemic.
27   [47] Robert Fairlie, *The Impact of Covid-19 on Small Business Owners: Evidence of Early-*
     *Stage Losses from the April 2020 Current Population Survey,* Stanford Inst. for Econ. Policy
28   Research 8 (May 2020), https://tinyurl.com/SIEPRCovid.

14

1    By adding hurdles to obtaining asylum, the Rule impedes asylum seekers from obtaining

2    legal status, thereby significantly lowering the tax revenue, economic contributions, and essential

3    services that the States receive from asylum seekers participating in the economy.

**CONCLUSION**

5    For the foregoing reasons, *Amici* States request this Court to grant Plaintiffs' Motion.

6    Dated:  December 29, 2020                                    Respectfully Submitted,

7                                                                 XAVIER BECERRA
                                                                  Attorney General of California
8                                                                 MICHAEL NEWMAN
                                                                  Senior Assistant Attorneys General
9                                                                 SUSAN SLAGER
                                                                  Supervising Deputy Attorney
10                                                                General JASLEEN SINGH

11                                                                */s/ Marissa S. Malouff*

12                                                                MARISSA S. MALOUFF
                                                                  Deputy Attorneys General
13                                                                *Attorneys for Amicus Curiae State of*
                                                                  *California*

14

15   PHIL WEISER                                                  WILLIAM TONG
     *Attorney General*                                          *Attorney General*
16   *State of Colorado*                                         *State of Connecticut*
     Ralph L. Carr Judicial Building                             165 Capitol Avenue
17   1300 Broadway, 10th Floor                                   Hartford, CT 06106
     Denver, CO 80203
18

19   KATHLEEN JENNINGS                                           CLARE E. CONNORS
     *Attorney General*                                         *Attorney General*
20   *State of Delaware*                                        *State of Hawaii*
     Carvel State Building, 6th Floor                            425 Queen Street
21   820 North French Street                                     Honolulu, HI  96813
     Wilmington, DE 19801
22

23   KWAME RAOUL                                                 AARON M. FREY
     *Attorney General*                                         *Attorney General*
24   *State of Illinois*                                        *State of Maine*
     100 W. Randolph St., 12th Fl.                               6 State House Station
25   Chicago, IL 60601                                           Augusta, ME  04333-0006

26

27

28

15

1

BRIAN E. FROSH
*Attorney General*
*State of Maryland*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202

2

3

MAURA HEALEY
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA  02108

4

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

5

6

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

7

8

AARON D. FORD
*Attorney General*
*State of Nevada*
555 E. Washington Ave., Suite 3900
Las Vegas, NV  89101

9

10

GURBIR S. GREWAL
*Attorney General of New Jersey*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

11

12

HECTOR BALDERAS
*New Mexico Attorney General*
408 Galisteo St
Santa Fe, NM 87501

13

LETITIA JAMES
*New York State Attorney General*
28 Liberty Street
New York, NY 10005

14

15

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

16

JOSH SHAPIRO
*Attorney General*
*Commonwealth of Pennsylvania*
Strawberry Square
Harrisburg, PA 17120

17

18

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

19

20

THOMAS J. DONOVAN, JR.
*Attorney General of Vermont*
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001

21

22

MARK R. HERRING
*Attorney General*
*Commonwealth of Virginia*
202 North 9th Street
Richmond, VA 23219

23

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100

24

25

KARL A. RACINE
*Attorney General*
*District of Columbia*
400 6th Street, NW
Washington, D.C. 20001

26

27

28

16